DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Michael Masters | ) | |
| | ) | CASE NO. 5:07 CV 1826 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| Supplemental Executive Retirement Plan for | ) | MEMORANDUM OPINION |
| Automated Packaging Systems, Inc., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Michael Masters (Masters) brought this action under the Employee Retirement

Income Security Act of 1974, 29 U.S.C. § 1001 et seq. (ERISA), against his employer

Automated Packaging Systems, Inc. (APS or the Company), its pension benefit plan

Supplemental Executive Retirement Plan (SERP), and the Administration Committee of the APS

SERP (the Committee), to recover benefits allegedly due him under the SERP.  In the

alternative, Masters claims entitlement to benefits under equitable estoppel.[1]  Masters also claims

entitlement to attorney fees.

I. Procedural Background

This is an appeal of the decision of the Administration Committee of the APS SERP

which denied certain benefits and allegedly misinterpreted the language of certain other benefits

available under the SERP.  The parties have filed the record of the proceedings with the Court.

The Court has reviewed the record and competing briefs.

The Court finds for the plaintiff.  Its analysis follows.

_____

[1]The Court has analyzed this matter on the merits and, therefore, need not address the
issue of equitable estoppel.

II. Factual Background

A. Employment History

APS hired Masters as its Chief Financial Officer in 1984.  In Fall, 1987, Masters was diagnosed with a chronic, progressive eye disease called macular degeneration.[2]

APS adopted a Supplemental Executive Retirement Plan (SERP), effective April 1, 1988, to "attract, retain and motivate highly competent Senior Management."  (Administrative Record, p. 22).[3]  The SERP provided retirement, death and disability benefits for senior executives and their beneficiaries.  (*Id*).  The parties do not dispute that Masters was a participant in the SERP.  (Record, p. 55).

By 1990 Masters required mechanical assistance to read, but he was able to continue his duties.  (Record, pp. 528-531).  At about this time, APS began searching for a new CFO to replace Masters.  (Record, p. 531).  In August 1991, APS hired Jerry Stufflebean as treasurer.  (Record, p. 532).  APS expected that Stufflebean would eventually assume the position of CFO, although at the time Masters was still active in the position at the Company.  (Record, pp. 531-532) and had begun negotiations to sell the "sleeve business" of APS.  (Record, pp. 536-537).

In 1991, Masters successfully negotiated a joint venture between APS and Illinois Tool Works (ITW).  He then established the company's financial system and acted as the CFO.  (Record, pp. 537-550).  In early 1992, APS paid Masters a $250,000 bonus which Masters characterized as a reward for his "outstanding performance" in 1991 successfully negotiating and

---

[2]The disease blocks central eyesight progressing to blindness or near total blindness.

[3]The complete 1041 page administrative record was filed with the Court in two volumes. Citations to the administrative record will be indicated by "Record," followed by the page reference.

2

managing the ITW joint venture. (Record, pp. 551-552). APS does not dispute this characterization.

By January 18, 1993, at the age of 52, Masters was legally blind and retired from APS under his disability. (Record, p. 425). The Company's long term disability insurer, UNUM, determined Masters was disabled as of January 19, 1993 and began paying his disability benefit on April 19, 1993. (Record, pp. 454-455). Additionally, the Social Security Administration determined that Masters was disabled as of January 18, 1993. (Record, p. 447).

Under SERP § 3.4, Masters was entitled to retirement benefits on the "first day of the month after his Normal Retirement Date." (Record, pp. 30-31). Under SERP § 1.11, Masters would reach the SERP Normal Retirement Date (NRD) on the first day of the month coinciding with or next following his "attainment of age sixty-five." (Record, p. 25). Masters was born on February 17, 1941 and his NRD and date of eligibility for retirement benefits was, therefore, on March 1, 2006. (Record, pp. 3, 60, 417).

B. Request for Calculation of Benefits

Masters approached APS repeatedly, personally and through counsel, to obtain and receive benefit calculations consistent with his interpretation of the terms of the Plan. (Record, pp. 11, 12-13, 54-71, 128-130, 131-135). APS responded with different figures based on different interpretations of: 1) whether the SERP definition of "Compensation" included bonuses and certain fringe benefits,[4] (2) whether a SERP provision regarding a 7% annual salary

---

[4] The parties referred interchangeably to disputed W-2 income as "taxable fringe benefits" and "miscellaneous items." For clarity the Court will refer to it uniformly as "Miscellaneous Items."

3

increase was applied to his salary only once or to each year of his disability retirement, until he reached the age of 65, and (3) whether he became disabled in 1993 or 1991.  (*Id*.).

Masters approached Pollock and Pollock, Inc. (Pollock) on February 10, 1993.  (Record, pp. 477-484).[5]  Pollock prepared a calculation of benefits called "First Draft Discussion and Question Session."  (*Id*.).  Pollock did not show calculations but quoted a "Projected Final Salary (with 7% Scale)" of $511,096, a "Final Three Year Average Salary" of $478,389, and a "Net Annual SERP Benefit (At Age 65)" of $173,102 per year [or $14,425 per month.]  (Record, p. 484).[6]

Masters' next response was from APS human resources vice president Ken Jordan on July 14, 2000.  (Record, p. 11).  Jordan did not explain his calculation, but informed Masters he would receive $6,535 per month for a 15-year certain period.  (*Id*.).[7]

On December 17, 2004, APS' counsel Steven Kresnye provided Masters' counsel Paul J. Singerman with another calculation of benefits called "MTM Normalized SERP Computation"

---

[5]Pollock & Pollock, Inc. was an insurance brokerage and consulting firm that designed and implemented the SERP for APS.

[6]According to Plaintiff's Second Amended Complaint, this calculation; (1) included bonuses in Compensation, (2) used a disability date of 1993, and (3) calculated his Projected Accrued Retirement Benefit (PARB) by compounding his pre-disability (1992) retirement date Compensation 7% *each year* until his Normal Retirement Date at age 65.  (Second Amended Complaint, para. 18).

[7]According to Plaintiff's Second Amended Complaint, Jordan's calculation used: (1) a definition of Compensation that *excluded* bonuses (specifically the $250,000 bonus) and Miscellaneous Items of his 1992 income, (2) a 1993 disability date, and (3) a one-time (not annual) 7% increase in his 1992 salary. (Second Amended Complaint, para. 24).

(Record, pp. 12-13).  Kresnye calculated a "Net annual SERP benefit" of $104,080 [or $8,673.33 per month.] (Record, pp. 13-14).[8]  Kresnye acknowledged that this was what "the Company is willing to pay Mike for his SERP benefit.  This computation attempts to arrive at what Mike would have received had he continued to work for the Company.  **It does not represent what the Company believes Mike is entitled to under the SERP plan.**  As to Mike's entitlement, **all of the extraordinary, one time compensation items in 1992 should be excluded** from the computation."  (Record, p. 12) (emphasis added).

On December 23, 2004, Singerman sent a letter to Kresnye disagreeing with the calculations.  (Record, pp. 15-17).[9]  Kresnye responded in a December 30, 2004 email maintaining that the 7% applied one time and that the special bonus was not includible in the calculation.  (Record, p. 18).  Kresnye indicated, further, that "we consider your response to be so extreme that we do not see how further discussions can be productive at this time."  (*Id.*).

On March 4, 2005, Masters' newly-retained co-counsel Gregory Viviani (Viviani) sent a letter to the APS Administration Committee expressing that there had apparently been a "denial of the claim of Mr. Masters for benefits under the Plan" and that "[i]n accordance with Section

---

[8]According to Plaintiff's Second Amended Complaint, this figure was higher, but still: (1) excluded from Compensation his bonus and Miscellaneous Items, and (2) failed to increase his compensation by 7% each year.  (Second Amended Complaint, para. 25).

[9]Specifically, Singerman cited Kresnye's failure to include "all remuneration . . . including wages or salaries, commissions, overtime or bonuses . . . ," and his failure to apply "an annual increase of 7% per year" to the salary.  Singerman conceded that Masters was willing to "deduct from his 1992 salary the $250,000 bonus" and use a "more normal bonus of $50,000" in its place.  (Record, pp. 14-15).

9.3 of the Plan, Mr. Masters hereby appeals the denial of his claim."  (Record, p. 1).[10]  Masters

claimed he was entitled to a monthly retirement benefit of $31,571.65.  (Record, p. 8).

On May 9, 2005, APS, through counsel Christopher Williams (Williams) issued a

position statement disagreeing with Masters.  Williams asserted that Masters became disabled in

1991, had used an "incorrect and exaggerated" figure for Compensation and, even if he were

disabled in 1992, was not entitle to include the $250,000 "special bonus" in calculations.

(Record, pp. 54-55).  Williams also indicated that Masters misapplied the terms of the Projected

Accrued Retirement Benefit under SERP § 1.16.  According to Williams, Masters was entitled to

his 15 year benefit under SERP § 4.1 in a monthly amount of $9,748.43 (if disabled in 1991),

$17,482.50 (if disabled in 1992) or $6,846.95 (if disabled in 1993.)  (Record, pp. 66-71).

On May 16, 2005 Viviani indicated, apparently in response to a May 13, 2005 inquiry

from Williams, that Masters wished to participate in "any hearing regarding his claim." (Record,

p. 131).  He also requested time to address the Company's assessment that Masters had become

disabled prior to 1993, since "all of the Company's prior communications in regard to this point

had clearly shown that the Company believed that Mr. Masters had become disabled in

1993 . . . ." (Record, p. 133).

On July 1, 2005, Viviani provided a second letter to Williams in response to "the

Company's statement of position."  (Record, p. 136).  Viviani indicated that, "we are quite

certain that the Company has not disclosed all of the relevant documents; and that this action,

---

[10]Viviani cited Masters' disagreement with the "methodology the Company used to
calculate his Projected Accrued Retirement Benefit" (Record, p. 1).  Viviani used a 1993
disability retirement date, a definition of Compensation which included salary, bonuses and
Miscellaneous Items, and a 7% yearly increase in Masters' Compensation in his calculation
(Record, p. 8).

6

coupled with its shifting positions on the question of the date of Mr. Masters's disability, indicates that the Company is not acting in good faith in regard to this matter.  (Record, p. 137). Based on a 1992 disability date, an interpretation of the "7% annual salary" provision of SERP §1.16 to apply yearly to base salary, and inclusion of the 1992 bonus of $250,000 and other Miscellaneous Items in Compensation, Viviani claimed that Masters was entitled to a monthly benefit of $53,093.  (Record, p. 210).

Williams prepared a letter to the APS "Administration Committee," with copies to counsel, on August 1, 2005 and denied bad faith in withholding records, stating that the records were only to be provided contingent on the Administration Committee holding a hearing, which had been cancelled.  Williams maintained the Company's previous position on the outstanding legal issues.  (Record, pp. 211-227).

On August 10, 2005 Viviani prepared his own letter to the Administration Committee in response to the August 1, 2005 letter.  Viviani maintained his previous position on all issues regarding Masters' benefit entitlement.  (Record, pp. 295-308).[11]

C. The Decision of the APS Administration Committee

The decision of the APS Administration Committee, in response to Masters' revised claim for benefits, followed on September 14, 2005.  (Record, pp. 333-344).  The Committee concluded that Masters became disabled in 1991, (Record, p. 336), that the "7% increase" was a one-time, singular event and applied to salary only, not a "salary increase of 7% each year during the disability period [or] . . . a 7% increase in all other forms of compensation, including

---

[11]i.e., that he became disabled in 1993, that the "7%" figure applied to each year's salary and that Compensation included the $250,000 bonus and Miscellaneous Items.

bonus . . . " (Record, p. 340).  The Committee also concluded that Compensation, for purposes of

calculating SERP benefits, included only "regular salary and bonus."  (Record, p. 342).  Based

on these assumptions, the Committee used Masters' 1990 salary (without $76,535 bonus) of

$127,250 and increased it by 7% to $136,158.  Adding back his bonus of $76,535, the

Committee computed his 1990 Compensation to be $212,692.[12]  Then, the Committee calculated

his "Final Average Earnings" under SERP §1.10 by multiplying "3 times his 1990 Compensation

divided by 36" to arrive at $17,724.33.  The Committee then took 55% of the "Final Average

Earnings" of $17,724.33 to arrive at his "Accrued Retirement Benefit" under SERP § 1.1 of

$9,748.38.  The Committee stated that this figure "also ends up to be his 'Projected Accrued

Retirement Benefit.'" (Record, p. 344).  The Committee reduced this figure by "Other

Retirement Benefits" of $1,937.68 per month[13] leaving Masters with a benefit of $7,810.71 per

month.  (Record, pp. 343-344).

APS vice president of finance Daryl Manzetti issued a September 22, 2005 facsimile to

Viviani and Williams advising them of Masters' right of review under SERP § 9.3.  This allowed

Masters to request a review by the Board of Directors if his claim was denied in whole or in part.

(Record, pp. 345-346).  In a twenty-six page November 21, 2005 facsimile (with supporting

exhibits), Viviani requested a hearing and review by the Board of Directors.  (Record, pp. 347-

499).

---

[12]The Court calculated this number to be one dollar more at $212,693.

[13]The Committee cited to SERP § 1.12 which identified Other Retirement Benefits as any
benefits under the APS Employee Capital Accumulation Plan, Stock Bonus Trust and Plan and
any pension, profit sharing, stock bonus or retirement plan, practice or program of the Company
other than the APS, Inc. Employees' Pension Trust Agreement and Plan or Federal Social
Security.

8

D. The Evidentiary Hearing and Decision of Hearing Examiner

On September 18-19, 2006 and November 10, 2006, eight witnesses[14] were examined on the issues attendant to Masters' disability benefits before Matthew Lerner, hearing examiner.[15] The transcript and record of the proceeding span nearly 1,000 pages.  (Record, pp. 500-1409).

The parties exchanged post-hearing briefs.  (Record, pp. 1410-1484) and on April 2, 2007 hearing examiner Lerner released his decision concluding that Masters became disabled in 1991, that the "7% increase" was a one-time increase that applied to salary only, and that Masters' Compensation did not include Miscellaneous Items *or* the $250,000 bonus.  (Record, p. 1487).  Lerner determined that Masters' benefit was $7,810.71 per month.  (Record, p. 1521).[16] Viviani requested a review by the Board of Directors which, on July 16, 2007, affirmed the findings of the Hearing Examiner and determined that Masters' benefit was $7,589.51 per month.  (Record, pp. 1542-1150).  This lawsuit followed.

---

[14]Witnesses were plaintiff Michael Masters, APS former senior financial analyst David Kuboff, APS vice-president of human resources Kenneth Jordan, APS chairman and co-founder Hershey Lerner, APS president and co-founder Bernie Lerner, APS CFO Jerry Stufflebean, APS executive vice-president Daryl Manzetti and former APS/ ITW engineer John VanDomelen. (Record, pp. 500-1409).

[15]Matthew Lerner is executive vice-president of APS, Bernie Lerner's son and Hershey Lerner's nephew.  (Record, pp. 10-11).

[16]This figure was reduced to $7,306.70 per month to reflects APS' omission of the offset of the Employee Stock Ownership Trust & Plan ("ESOP") as an "Other Retirement Benefit" from the monthly benefit.  (Record, pp. 1522-1524).  The ESOP offset issue generated another eight letters/emails among counsel over the subsequent five weeks.  (Record, pp. 1522-1541).

9

### III. The Supplemental Executive Retirement Plan[17]

The parties do not dispute that Masters was a Senior Executive or that he became eligible for benefits under SERP § 3.4 on his Normal Retirement Date, March 1, 2006.[18] SERP § 1.11 states the Normal Retirement Date is the "first day of the month coinciding with or next following the later of: (a) a Participant's attainment of age sixty-five (65); or (b) a Participant's completion of ten (10) years of Vesting Service."  Masters was born on February 17, 1941.

The pertinent SERP and Capital Accumulation Plan (CAP) provisions are attached hereto as "Appendix A."

As set forth in CAP § 2.30, a person is not totally and permanently disabled until the physical or mental conditions of such participant renders him "permanently unable to perform the duties of his occupation . . . . "  Further relevant is the description of the occupation of CFO.

In 1992, APS prepared a Job Description for the position of CFO.  The CFO was to "direct the Company's Treasury, Controller, and Financial Services functions . . .[p]articipate in planning and controlling corporate growth . . . develop[] corporate financial objectives, including short and long-range programs, and formulate[] plans to meet these objectives."  The CFO was also to have "exceptional foresight and objectivity as well as a proven capacity for rendering mature business decisions . . . [and] . . . actively participate[] in planning, approving, revising,

---

[17]The full text of the APS SERP was found several times in the record and for brevity will be cited by the SERP section number.  The first notations of the plan appear at Record, pp. 20-53 and pp. 74-105.

[18]SERP Section 1.11 states the Normal Retirement Date is the "first day of the month coinciding with or next following the later of: (a) a Participant's attainment of age sixty-five (65); or (b) a Participant's completion of ten (10) years of Vesting Service."

10

and implementing overall corporate growth strategies and policies."  He was to "develop[],

recommend[], and obtain[] approval of short and long-range corporate plans and strategies . . . "

(Record, pp. 408-409).

IV. Law

A. Standard of Review for ERISA Claims

A person denied benefits under his employee retirement benefit plan may bring a civil

action to recover benefits due to him under the terms of his plan.  29 U.S.C. 1132(a)(1)(B).

Where, as here, the "benefit plan expressly gives the plan administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the plan's terms . . . a

deferential standard of review is appropriate."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S.

101, 102 (1989); *see also DeLisle v. Sun Life Assur. Co. of Canada*, No. 08-1142, 2009 WL

529171, at *4 (6th Cir.  March 4, 2009) (holding that where the administrator is vested with

discretion to interpret the plan, a denial of benefits is reviewed under the arbitrary and capricious

standard).

In this case, the APS SERP granted APS administrators the discretion to interpret the

Plan and determine a Participant's right to benefits. SERP § 9.1.   Accordingly, this Court must

apply a deferential standard when reviewing APS' determinations regarding Masters' eligibility

for benefits and APS' interpretation of plan terms.

The court in *Bennett v. Kemper Nat'l Serv. Inc.,* 514 F.3d 547, 552 (6th Cir. 2008) held

"When, as is the case here, the benefit plan gives the plan administrator discretionary authority

to determine eligibility for benefits, we will reverse the administrator's decision only if it is

arbitrary or capricious." *Bennett,* 514 F.3d at 552 (citing *Gismondi v. United Techs. Corp.,* 408

11

F.3d 295, 298 (6th Cir. 2005)).  A review under the arbitrary and capricious standard requires a review of the quality and quantity of medical evidence "and the opinions on both sides of the issues" *DeLisle,* at *4 (quoting *McDonald v. W.-S. Life Ins. Co.,* 347 F.3d 161, 172 (6th Cir. 2003)).  The administrator's decision will be upheld under this standard if it is the result of a "deliberate, principled reasoning process and if it is supported by substantial evidence." *DeLisle,* at *4 (citing *Glenn,* 461 F.3d at 666).

Although review pursuant to the arbitrary or capricious standard is extremely deferential, "'[i]t is not, however, without some teeth.  Deferential review is not no review, and deference need not be abject.'" *Smith v. Bayer Corp. Long Term Disability Plan,* 275 Fed.Appx. 495, 504 (6th Cir. 2008) (quoting *McDonald,* 347 F.3d at 172)(citations and internal quotation marks omitted).

The Court considers several factors in determining whether the administrator's interpretation of the plan was the result of a deliberate, principled reasoning process including the existence of a conflict of interest and the plan administrator's consideration of the Social Security Administration's findings.  *DeLisle* at *4.[19]

---

[19]The Sixth Circuit has found the denial of benefits arbitrary and capricious where the administrator did not consider the determination made by the Social Security Administration or the treating doctor's opinion, but relied on an opinion by a hired doctor who reviewed incomplete records.  *Leffew v. Ford Motor Co.,* 258 Fed. Appx 772, 778-781 (2007).  *See also Smith v. Bayer Corp. Long Term Disability Plan,* 275 Fed. Appx. 495, 508 (2008) (holding that administrator's denial was arbitrary and capricious when based upon faulty experts' opinion). By contrast, the Sixth Circuit has found that an administrator's decision was not arbitrary or capricious where the administrator's experts reviewed current medical record, authored reports without gaps or contradictions therein, and agreed with the findings of the Social Security Administration.  *Hall v. National City Corp. Welfare Benefits Plan,* 2008 WL 1901388 (N.D. Ohio) at *7-*10.

B. Conflict of Interest Weighed as a Factor

A reviewing court should consider conflict of interest as a factor in determining whether the plan administrator has abused its discretion in denying benefits. *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. ____, 128 S. Ct. 2343, 2346 (2008).  To apply the abuse of discretion standard in such a case, the Court stated, "The significance of the [conflict of interest] factor will depend upon the circumstances of the particular case" *Id.* at 2346 (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)).  Further, the Court instructed:

> The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and promote accuracy . . .

*Id.* at 10-11. [20]

In *Roumeliote v. Long Term Disability Plan for Employees of Worthington Industries*, 292 Fed.Appx. 472, 474 (6th Cir. 2008), the Sixth Circuit recognized the duty set forth in *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. ____ , *supra,* to consider conflict as a factor, but to apply the arbitrary and capricious standard of review.  The Court stated:

> This term the United States Supreme Court re-examined the manner in which reviewing courts are to assess the effect of an inherent conflict of interest. *Metro. Life Ins. Co. v. Glenn*, ___ U.S. ___, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) . . . [T]he Court expressly approved of the approach first enunciated in *Firestone* [*Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111 (1989)], *supra*, and followed by this court in *Glenn*: '[W]hen judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one.' *Glenn*, 128 S.Ct. at 2351.

---

[20] In *Firestone,*  the Supreme Court stated that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." 489 U.S. at 115, 109 S.Ct. at 957 (1989).

13

*Roumeliote, supra,* at 474.[21]

Further, conflicts are irrelevant if they do not actually motivate the challenged decision. "Where a 'review of the record reveals no significant evidence that [the administrator] based its determination on the costs associated with [the claimant's ] treatment or otherwise acted in bad faith, we cannot conclude that [the administrator] was motivated by self-interest.'" *Hockin v. Kmart Corp. Long Term Disability Income Plan,* 105 Fed. App'x 755, 757 (6th Cir. 2004) (quoting *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998)).  If there is nothing in the administrative record to suggest that a plan administrator was influenced by its financial interest in denying benefits, the court will not find that the conflict affected the outcome. "'There must be some evidence in the administrative record to suggest that Defendants' decision was motivated or influenced by its financial interest in minimizing Plan payments . . . . " *Pflaum v. Unum Provident Corp.,* 340 F.Supp.2d 779, 784 (E.D. Mich 2004)(quoting *Monks v. Keystone Powdered Metal Co.*, 78 F.Supp.2d 647, 664 (E.D.Mich.2000)).  Defendant's financial stake in benefit determinations alone is does not suggest a conflict. *Id.*

C. Law of Plan Interpretation

As stated above, a district court applies the arbitrary and capricious standard of review to an ERISA-plan administrator's decision regarding benefits where, as in this case, the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or when

---

[21]*See also Helton v. ACS Group,* 964 F.Supp. 1175, 1179 (E.D.Tenn.,1997); and *MetLife v. Glenn*, 461 F.3d 660, 666 (6th Cir. 2006)(upholding the decision of an administrator despite conflicts of interest where the decision is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence")(citing  Baker v. United Mine Workers of Am. Health & Ret. Funds, 929 F.2d 1140, 1144 (6th Cir.1991)).

the administrator or fiduciary has discretion to construe the terms of the plan.[22]  *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. at 115; *Marquette Gen. Hosp. v. Goodman Forest Indus.,* 315 F. 3d 629, 632 n. 1 (6th Cir. 2003).[23]  Under this standard, the Court will uphold the interpretation if it is reasonable.  If the plan administrator's interpretation "adheres to the language of the plan 'as it would be construed by an ordinary person'" then it is reasonable.  *Anderson v. Emerson Electric Co.,* 161 Fed. Appx. 504, 507 (quoting *Shelby County Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund,* 203 F.3d 926, 934 (6th Cir. 2000)).  Further, where there is no ambiguity in the plan language and it "rationally supports the Plan Administrator's interpretation and application of it" it will not be overturned as arbitrary and capricious.  *Marquette General Hospital,* 315 F. 3d at 633.[24]

V. The Court's Findings and Analysis

This Court has reviewed the 1,150 page record of the matter and briefs of counsel.  It has considered testimonial and record evidence spanning twenty years.  After review of the record and applicable law, this Court makes the following findings:

---

[22]*See* SERP § 9.1

[23]Further, a reviewing court "must accept a plan administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by the participants." *Anderson v. Emerson Electric Co.,* 161 Fed. Appx. 504, 506 (citing *Morgan v. SKF USA, Inc.,* 385 F.3d 989, 992 (6th Cir. 2004)).

[24]*See also, Fuller v. National Union Fire Insurance Company of Pittsburgh,* No. 07-138, 2008 WL 2224885, at *8 (E.D. Ky. May 27, 2008) (holding that under arbitrary and capricious standard, National Union's interpretation of the policy had to be rational in light of the plan's provisions).

A. Date of Masters' Disability Retirement

This court has considered plaintiff's assertion that he became disabled in 1993 when he retired.  It has evaluated evidence that throughout 1990-1991 Masters had no difficulties performing his job as CFO (Record, p. 533), that he traveled to Japan and conducted face-to-face negotiations to explore a joint venture there (Record, pp. 534-535), and was involved in negotiations with the Austrian government through this period to help develop an APS presence in Austria, which ultimately became the site of a joint venture with ITW.  (Record pp. 539-542). The Court has also considered evidence that Masters negotiated the joint venture between APS and Illinois Tool Works (ITW) from early 1991 until it was "signed" around the first of March, 1992.  (Record p. 545).  The Court has reviewed Masters' testimony that his efforts negotiating this deal required an analysis of the accounting books, at least one meeting with an investment banker in New York, dividing the assets of APS into the joint venture, hiring personnel, establishing a data processing system and essentially "starting a whole new business" (Record, pp. 536-543) in a project that put approximately $20 million "on the table" for APS.  (Record, p. 542).  The Court has considered testimony of Master's co-worker at APS,  John Van Domelen, who testified that "It was smart to sell.  Mike Masters at the time packaged the business up and we sold it to ITW." (Record, p. 986) and "I give him the bulk of the credit" for the venture. (Record, pp.1007-1008).  The Court has also reviewed testimony that Masters was APS' representative in the joint venture, watching over their interests well into 1992.  (Record, p. 546).

The Court finds, after reviewing further evidence, that no one at APS indicated Masters was physically unable to do his job during the period he was negotiating the ITW deal.  (Record, p. 546).  The Court finds that, prior to October 1992, Masters' physician never informed him he

16

was physically incapable of performing his job.  (Record, pp. 555-556).  Further, once the joint venture was "signed" in March, 1992, the Court finds that Masters demonstrated high-level functioning as a Senior Executive for APS for at least six to eight months thereafter while he developed the joint venture's operating systems.  (Record, pp. 542-545).  Perhaps he was not *called* the CFO of APS, but his work hiring ITW personnel, developing its computer system, dividing APS' assets between APS and the joint venture, and acting as the CFO of the joint venture was the work of a CFO as the company itself defined it.  (Record, pp. 548-550).  The Court finds further that he was executing these highly professional duties until the end of 1992 or into early 1993.  (Record, pp. 555-556, 1007-1008).

The Court also finds that Masters' 1992 bonus of $250,000 was for his "outstanding performance" negotiating the ITW deal and that the Lerners' expression of how happy they were with Masters for the joint venture substantiates this finding.  (Record, pp. 551-552).

The Court has considered the arguments of APS that Masters became unable to perform his duties as CFO of APS and was therefore disabled from his occupation when he was replaced by the new CFO Jerry Stufflebean in September 1991.  APS cites Masters' hearing testimony that Masters lost his office, staff and all Automated CFO functions when Stufflebean was hired to support that Masters was disabled in 1991.  (Record, pp. 531-533, 543, 620).  APS asserts, as further support, that serving as the ITW CFO involved a "much reduced scope" with a "much smaller operation" (Record, pp. 550-551, 620, 624) and that by October 1992 Masters' doctor wrote to APS that Masters could not fulfill the diminished role of CFO for ITW.  (Record, pp. 571, 644-645).[25]

---

[25]APS also asserts, as evidence that Masters was disabled as of 1991, that a cognovit note (continued...)

The Court finds these arguments unpersuasive.

CAP § 2.3 states that a participant is disabled when his disability "renders such participant permanently unable to perform the duties of his occupation." By its own definition, the duties of the occupation of CFO are to "direct the Company's Treasury, Controller, and Financial Services functions," "develop[] corporate financial objectives . . . short and long-range programs . . . [and have] proven capacity for rendering mature business decisions . . . and actively participate[] in "planning, approving, revising, and implementing overall corporate growth strategies and policies." (Record, pp. 408-409). The testimony APS offers as support of Masters' inability to develop financial objectives and implement corporate growth strategies is no support at all.

Masters testified that Stufflebean was going to "take over right away" as CFO of APS, that he had no "CFO functions at APS" after 1991 and that his office was moved to the back of the building when Stufflebean started. (Record, pp. 531-533, 543, 620). He did not testify that he was no longer operating in corporate growth strategies or business decisions. The other testimony APS cited (that the job of CFO at the ITW joint venture was in a "much reduced scope because it's a smaller business" (Record, pp. 550-551) and that Masters worked fewer hours in 1992 than in previous years because ITW was a smaller operation (Record, p. 624)) was equally

---

[25](...continued)

prepared for Masters in July 1991 to purchase rental property was "in order to give him something meaningful to do after his contemplated forced disability retirement." (Record, p. 57).

unpersuasive.  APS' position that the physician letter demonstrated his inability to perform his occupation was likewise unsupportive.[26]

The Court instead finds that while the Stufflebean took the *title* of APS' CFO in 1991, Masters continued executing duties *described* by the job description into 1993; especially as they related to "participating in planning and controlling corporate growth," developing "short and long-range programs," and actively participating in planning "revising and implementing overall corporate growth strategies . . . "(Record, pp. 408-409).  The Court finds that Masters' role as an architect of the ITW merger *was* "planning and controlling corporate growth," developing corporate financial objectives, and formulating plans to meet these objectives.  (Record, pp. 408-409).  Masters continued as a Senior Executive hiring personnel for ITW, developing its business systems and acting as its first CFO.[27]  The Court finds that he was engaged in these duties well through 1992.  (Record, pp. 540-545, 548) and until the day he retired on January 18, 1993. (Record, pp. 555-557).

---

[26]Masters testified that the letter was to trigger disability benefits.  He was asked:
Q: When your treating physician in October of 1992 wrote a letter to Automated Packaging saying that in his opinion, you were unable to continue doing your job, did you argue with him?
A: No.
Q: Why?
A: Because the company told me they needed that letter to get me on the disability.
Q: But you personally felt that your treating physician in October of 1992 was wrong?
A: I felt I could do my job.
(Record, p. 571, ln. 3-13).

[27]Senior Executive Employees designated by the board were SERP participants (SERP § 2.2) and as stated, the parties have not disputed that Masters was a participant.  Further SERP § 2.4 provides that the Board of Directors may determine that any Senior Executive is no longer entitled to be so designated.  APS has cited nothing in the record to support such a designation was ever withdrawn.

APS' determination that Masters was disabled in 1991 is not supported by substantial evidence nor can it be called the result of a deliberate, principled reasoning process. *Bennett v. Kemper Nat'l Serv. Inc.*, 514 F.3d at 552; *DeLisle* at *4. To the contrary, substantial and persuasive evidence demonstrates that Masters continued with exemplary performance in a multimillion dollar business venture until he retired.  (Record, pp. 536-545).

The plan language was unambiguous, but the Court addresses any argument on the interpretation of the plan here.  APS' conclusion that Masters was disabled in 1991 is not consistent with the plain language of the definition of "occupation" and CAP § 2.3.  A conclusion that he was disabled in 1991 based on this interpretation is not reasonable.  Its interpretation that he stopped meeting the responsibilities set forth in the job description starting in 1991 is not consistent with the way an ordinary person would construe it since the evidence shows that Masters was responsible for APS' interest in the ITW joint venture through 1992 and was actively engaged in these duties. *Anderson*, 161 Fed. Appx. At 507.  APS' conclusion that he was disabled in 1991 based on this interpretation, therefore, was not rationally supported by the plan language and will not be upheld. *Marquette General Hospital,* 315 F.3d at 633.

In addition, the Court must also consider whether conflict of interest played a role in APS decision that Masters date of disability was 1991. *De Lisle v. Sun Life Assurance Co,* 2009 WL 529171, at *4, *Glenn v. MetLife,* 461 F.3d at 665.

First, the Court may consider evidence of the disability date determined by the SSA. *De Lisle v. Sun Life Assurance Co,* No. 08-1142 at *4.  The SSA determined that Masters was disabled as of January 19, 1993.  (Record, p. 447). A contrary finding does not automatically entitle Masters to benefits, but where the Plan administrator encourages the applicant to apply

for SSA, benefits financially from the applicant's receipt of SSA, and then "fails to explain why it is taking a position different from the SSA, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious." *DeLisle*, No. 08-1142 at *6 (quoting *Bennett v. Kemper Nat'l Servs.* 514 F.3d 547, 554 (6th Cir. 2008)).[28] APS has failed to explain its contrary position here and this Court finds that this failure supports that it made an arbitrary and capricious decision based on conflict of interest.

Second, evidence of bias this Court will not ignore is the appointment of the Company Chairman Hershey Lerner's nephew/Company President Bernie Lerner's son Matthew Lerner as the hearing examiner.  Lerner's decision that Masters became disabled in 1991 was biased.  It was evident that this finding directly affected his father and uncle and the financial integrity of their company.  *Bennett v. Kemper Nat'l Serv. Inc.,* 514 F.3d at 552.  Such a decision would eliminate calculating the 1992 bonus of $250,000 into Masters' benefit and save APS tens of thousands of dollars.  Lerner based his determination on the costs associated with the claimant's benefit and was therefore motivated by self-interest.  *Hockin v. Kmart Corp. Long Term Disability Income Plan,* 105 Fed. Appx. at 757.  This conflict of interest further supports the conclusion that APS' assertion that Masters became disabled in 1991 is arbitrary and capricious and an abuse of discretion.

APS decision that Masters' disability began in 1991 is not supported by the evidence, is not the result of any reasoning process and was clearly motivated by self-interest.   The circumstances suggest a high likelihood that it affected the benefits decision.  *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. at _____, 128 S.Ct. at 2351.  The Court finds, therefore, that APS'

---

[28]*See also Hall v. National City Corp. Welfare Benefits Plan,* 2008 WL 1901388 (N.D. Ohio) at *7-*10.

determination was arbitrary and capricious and is reversed.  The Court finds that Masters'
disability began in January 1993.

B. The Seven Percent Annual Salary Increase

Masters argues that SERP § 1.16 provides him with a 7% increase, every year, of his
annual salary from the date of his disability retirement until his Normal Retirement Date.
Masters asserts that the fundamental principles of legal document construction demand that
meaning be given to each word, specifically in this case, the word "annual."  (Record, pp. 5-7).
He asserts further that English language dictionaries define "annual" as something that will
occur each and every year and applied in this case means the seven percent salary increase must
happen each and every year during the 13-year period between the onset of his disability and his
Normal Retirement Date.  (Doc. 20, p. 47).

In the alternative Masters argues that the plan is ambiguous and requires the Court to
consider extrinsic evidence to determine the plan's intended meaning.  (Doc. 20, p. 49).  He
offers the 1988 SERP specifications discussed during the Plan's formation, a "waiver of
premium" clause in the insurance policies purchased to fund the plan, the projected benefits
Pollock prepared for him on February 9, 1993, using an annual seven percent (7%) increase in
both his salary and bonus each year until he reached age 65, and subsequent amendments to the
Plan which excluded the annual increase of 7%.  (Record, pp. 465-476).

APS argues that the proper interpretation of the language of SERP § 1.16 is that Masters'
annual salary is increased by 7 % only once rather than increased by 7% every year.  (Record,
pp. 63-65).  If it were meant to apply annually, APS asserts, the 7% increase would apply to (i)
and (ii) of the provision and clear language to that effect (such as "compounding") would have
been included.  Further, APS argues, the term  "annual salary" is meant to distinguish salary

22

from "quarterly" or "monthly" salary and that the 7% figure is used to account for the use of the previous year's annual salary. (Record, pp. 63-65). As a result, APS asserts, "the figure calculated under § 1.16(b)(i) is Masters' Compensation in the year before the date on which he became 'Totally and Permanently Disabled,' plus a one-time increase of 7% to the annual salary." APS cites to testimony of APS president Bernie Lerner to support that a provision promising its participants an automatic 7% salary increase would be "ridiculous" and something he would never have approved. (Record, p. 804).[29]

Having reviewed the argument and evidence, this Court finds that APS' interpretation of the 7% increase is consistent with the plain language of the plan. Having adhered to the plan as it would be construed by an ordinary person, APS's interpretation is reasonable. *Anderson,* 161 Fed. Appx. at 507. The interpretation of "annual salary" to mean the salary one earns in a year is a common interpretation. Further, APS' interpretation and application of the 7% increase to *one annual salary* is rationally supported by the plan language. It makes sense that the plan compensates the disabled participant who wishes to use the prior year's salary, in its computation of SERP § 1.16, by increasing it 7%. *Marquette,* 315 F. 3d at 633.

As to the conflict of interest factor, the Court has considered APS' financial stake in determining that the 7% increase applied one time. *Pflaum v. Unum Provident Corp.,* 340 F.Supp.2d 779, 784 (E.D. Mich 2004). This alone, however, will not cause the Court to find that the administrator abused discretion, especially where it is supported by a rational interpretation of the language.

---

[29]Such compensation figures, APS asserts, would have created a material potential liability for APS about which CFO Masters would have been expected to warn the Company. (Record, p. 806).

Therefore, the Court finds that APS' conclusion, that SERP § 1.16 intends the 7% increase to be applied once to the annual salary the year before disability retirement, is not arbitrary or capricious.  This Court upholds that the 7% increase applies once.

C. Compensation

1. Miscellaneous Items

It is Masters' position that, along with salary and bonus, Miscellaneous Items such as loan forgiveness, transfer of the auto to him and "tax gross ups" associated with such items are remunerations to be considered part of "Compensation."  (Record, pp. 144-145).  Masters relies on the language of  SERP § 1.6 ("Compensation") which states compensation is, " . . . all remuneration paid by the company to a Participant for services rendered to the Company" to support his assertion.  Masters also cites testimony of Ken Jordan, then director of human resources, that the intent of the plan was to include Miscellaneous Items as Compensation. (Record, pp. 422-428).[30]

APS relies on the plain language of SERP § 1.6 to support its argument that Compensation includes only salary, bonuses and Masters' elective 401(k) contributions to APS' Capital Accumulation Plan.  (Doc. 21, p. 38, SERP §1.6, Record, pp. 226-227).  APS contends that Masters erred in including the W-2 "box 10 " figure in Compensation because; 1) it includes Masters' taxable fringe benefits and other transfers or payments which are not amounts paid to Masters for services rendered, 2) APS never included taxable fringe benefits in a Participant's Compensation under the SERP, and 3) APS would have expressly referred to Form W-2 had it

---

[30]Masters offers interpretations of other district courts which held that Miscellaneous Items are included in Compensation unless the plan language specifically excluded them. *cf. Adams v. Louisiana-Pacific Corp.,* 284 F.Supp. 2d 331 (W.D.N.C. 2003).

24

intended that a Participant use his W-2 in calculating his Compensation.  (Record, pp. 61, 226-227).[31]  For support, APS cites testimony of Jerry Stufflebean that, "I had my people starting to look at it and look at the SERP plan, our  interpretation of the SERP plan was that you should not include the W-2 stuff . . . that [the SERP Compensation] was base salary and your incentive bonus for the year."  (Record, pp. 949-950).

The Court has reviewed the evidence and arguments and finds that APS did not err in its interpretation of the language of "Compensation" set forth in SERP § 1.6 to exclude Miscellaneous Items.  Interpreting SERP § 1.6 Compensation ("all remuneration paid by the Company to a Participant for services rendered to the Company including wages or salaries, commissions, overtime or bonuses, whether discretionary or non-discretionary . . .") to mean amounts including wages, salaries, commissions, overtime or bonuses certainly adheres to the language of the Plan as it would be construed by an ordinary person.  *Anderson*, 161 Fed. Appx. at 507.  It is therefore reasonable.  The Court will not overturn this finding, then, as it is not arbitrary or capricious.  Compensation in this case does not include Miscellaneous Items and APS' decision in this regard is upheld.

### 2. Bonus

After acknowledging that SERP § 1.6 defines Compensation to include salary, *and bonuses*, APS asserts that Masters' $250,000 bonus should *not* be included in Compensation. For support, APS cites the December 23, 2004 letter from Masters' counsel Singerman which stated, "Mr. Masters recognizes that even though the plain language of the Plan would clearly include his extraordinary bonus paid in 1992 it was not his expectation that this bonus would be

---

[31]APS also cites its 'historical treatment" of compensation as only including salary and bonus.

25

included in calculating his retirement benefits.  Consequently, he is willing to deduct from his 1992 compensation the $250,000 bonus."  (Record, p. 129).

The plain language of SERP § 1.6 identifies Compensation as, " . . . all remuneration paid by the Company to a Participant for services rendered to the Company, **including wages or salaries**, commissions, overtime or **bonuses, whether discretionary or non-discretionary** . . . . " (emphasis added).  The word "bonuses" is included unambiguously in the definition.  It states they are included whether discretionary or non-discretionary.  Masters' counsel earlier attempts to settle the matter short of litigation by negotiating the bonus must not operate now to defeat  the plain language of the plan.  The Court cannot uphold an interpretation which excludes bonuses when an ordinary person would construe "bonuses" as bonuses.  *Anderson,* 161 Fed. Appx. at 507.  The Court finds that APS acted arbitrarily and capriciously and abused its discretion to exclude bonuses, including the $250,000 bonus.  *Marquette General Hospital*, 315 F.3d at 633.

The Court's analysis of conflict of interest regarding the bonus is uncomplicated.  APS had a clear financial interest in excluding bonuses from the definition of Compensation.  *Pflaum,* 340 F. Supp. 2d at 784.  Excluding the $250,000 bonus from the SERP benefit calculation would greatly reduce the cost associated with providing Masters his benefit.  *Hockin*, 105 Fed. Appx. at 757.  The conflict of interest in this regard is afforded considerable weight and supports that APS decision was arbitrary and capricious.  Therefore, to the extent APS calculated Masters' benefit without the 1992 bonus of $250,000 bonus, the Court finds APS abused its discretion.  Masters' Compensation under the SERP includes his salary *and* the $250,000 bonus.

D. Calculation of Benefits

Based on the Court's finding that Masters became disabled in 1993, that the $250,000 bonus is part of Compensation and that the 7% increase applies to Masters' annual salary one time, the Court calculates Masters' PARB as follows:

1. Compensation

To calculate PARB, SERP § 1.16 allows the Participant to choose the greater of two figures designated as Compensation.  He may select his Compensation the year of his disability SERP § 1.16(b)(ii)) or his Compensation the year prior to his disability plus a seven percent increase of his annual salary that year.  (SERP § 1.16(b)(i)).

Assuming Masters would choose the greater (1992), the Court calculates his Compensation as follows:

| 1992 Calendar Year | |
|---|---|
| Annual Salary 1992 | $139,600 |
| Seven Percent Annual Salary Increase | ($139,600 x 1.07) = $149,372 |
| Bonus | $250,000 |
| **TOTAL COMPENSATION** | ($149,372 + $250,000) = **$399,372** |

2. Final Average Earnings

To then calculate the Accrued Retirement Benefit, SERP § 1.1 requires calculating fifty-five percent (55%) of the participant's Final Average Earnings.  Final Average Earnings are defined by SERP § 1.10 as the highest three consecutive Compensations the participant received in the ten year period prior to his termination divided by thirty-six (36).  In this case, when calculating Final Average Earnings from a *projected* accrued retirement benefit, the Plan calls for the use of three times the projected Accrued Retirement Benefit (PARB) divided by 36 to calculate his Final Average Earnings.  (Record, p.344):

| PARB | $399,372 |
|---|---|
| PARB | $399,372 |
| PARB | $399,372 |
| Total | $1,198,116 |
| Divided by 36 months | ($1,198,116 ÷ 36) |
| **FINAL AVERAGE EARNINGS** | **$33,281** |

3. Accrued Retirement Benefit

SERP § 1.1 defines Accrued Retirement Benefit as fifty-five percent of the Final Average Earnings. The Court calculates that as follows:

| Final Average Earnings | $33,281 |
|---|---|
| SERP § 1.1 fifty-five percent adjustment | ($33, 281 x 0.55 ) = |
| **Accrued Retirement Benefit** | **$18,304.55** |

The Court finds that Masters is entitled to retirement benefits of $18,304.55 per month or **$219,654.60 per year** beginning on March 1, 2006.

28

VI. Conclusion

As indicated, the Court has decided the issues related to the retirement benefits due the plaintiff.  The Court must next decide the total amount to award the plaintiff.  The Court must decide whether the plaintiff is entitled to interest and, if so, how the interest is to be calculated.  Once the Court makes the final decision on the amount to be awarded, including the issue of interest, it will publish a judgment entry awarding a money judgment to the plaintiff.  Then the parties will have standing to appeal the Court's judgement.

The Court will publish the judgment entry awarding plaintiff money damages before it considers the issue of attorney fees.

The parties are directed to submit to the Court by March 30, 2009 a jointly approved judgment entry as to the money judgment to be awarded the plaintiff.  Such an entry will, of course, include the issue relating to interest.

In the event the parties are unable to agree on a proposed judgment entry, each party shall submit to the Court by April 6, 2009 a separate proposed judgment entry.

29

Counsel for the plaintiff shall submit a detailed application for attorney fees by April 6, 2009.  In the absence of a total settlement of all issues, counsel for the defendants shall respond to the plaintiffs application for attorney fees by April 20, 2009.[32]

IT IS SO ORDERED.

March 17, 2009      /s/ David D. Dowd, Jr.
Date          David D. Dowd, Jr.
             U.S. District Judge

---

[32]Nothing in this Order with respect to the dates contained herein shall be construed as a bar to the parties reaching a settlement on all issues.  In the event the parties jointly request, in writing, mediation, the Court will immediately assign Magistrate Judge Benita Pearson to conduct the mediation procedure.

30

# APPENDIX A

1. The Preamble to the APS "Supplemental Executive Retirement Plan" states:

WHEREAS, it is necessary for the Company to attract, retain and motivate highly competent senior management executives so that it may compete effectively . . . the Company has duly authorized the establishment of a Supplemental Executive Retirement Plan in order to provide certain retirement, death and disability benefits for its senior executives . . .

2. Article III, "Eligibility For Retirement Benefits" states:

3.4   Each Participant who becomes Totally and Permanently Disabled prior to his termination of employment with the Company, shall be eligible for retirement benefits under this Plan commencing on the first day of the month after his Normal Retirement Date.

3. Administration Committee - SERP § 1.3

1.3   The words "Administration Committee" shall mean the committee authorized to administer the Plan.  The Administration Committee shall consist of five (5) persons appointed by the Board of Directors at least two (2) of whom shall be Participants.

4. Article IX: ADMINISTRATION

9.1   The Administration Committee shall be responsible for the general administration of the Plan and shall have all such powers as may be necessary to carry out the provisions of the Plan . . . The Administration Committee shall have the following powers and duties:

> . . . (c) **To interpret the Plan**, and to resolve ambiguities, inconsistencies, and omissions, to determine any questions of fact, to **determine the right to benefits** of, and the amount of benefits, if any, payable to, any person in accordance with the provisions of the Plan.  (emphasis added).

5. Compensation - SERP § 1.6

1.6   "The word 'Compensation' shall mean all remuneration paid by the Company to a Participant for services rendered to the Company, including wages or salaries, commissions, overtime or bonuses, whether discretionary or non-discretionary, which is currently includible such [*sic* in such] Participant's gross income plus any amounts contributed by the Company pursuant to a salary

reduction agreement under the Automated Packaging Systems, Inc. Employee capital Accumulation Plan."

6. Final Average Earnings - SERP § 1.10

1.10  "The words 'Final Average Earnings' shall mean the total of a Participant's Compensation during the three (3) consecutive Plan Years falling within the ten (10) Plan Years inclusive of and next preceding the earlier of the date he ceased to be a Senior Executive or his date of termination of employment by the Company, during which his Compensation was highest, divided by thirty-six (36) . . ."

7. Accrued Retirement Benefit - SERP § 1.1

1.1  "The words 'Accrued Retirement Benefit' shall mean an amount equal to fifty-five percent (55%) of a Participant's Final Average Earnings . . ."

8. Amount of Retirement Benefit - SERP § 4.1

4.1  "Retirement benefits payable to a Participant pursuant to this article IV shall be payable commencing on the date specified in Section 3.1, 3.2, 3.3, or 3.4 hereof and shall be paid monthly for a period of fifteen (15) years.  If the Participant shall die prior to the end of the fifteen (15) year period, the balance of the payments will be made to his beneficiary . . . "

9. Monthly Amount of Retirement Benefits - SERP § 4.2

4.2  "The monthly amount of retirement benefits payable to a Participant whose benefit commences on or after his Normal Retirement Date and is payable under Section 4.1 hereof shall be equal to his Accrued Retirement Benefit, or, in the case of a Participant who is Totally and Permanently Disabled his Projected Accrued Retirement Benefit . . .

10. Projected Accrued Retirement Benefit - SERP § 1.16

1.16  The words 'Projected Accrued Retirement Benefit' shall mean the Accrued Retirement Benefit a Participant would have had at his Normal Retirement Date calculated on the assumptions that between the date he becomes Totally and Permanently Disabled and his Normal Retirement Date:

(a)      he would have remained employed by the Company;

(b)      he would have had Compensation during each Plan Year ending in such period in an amount equal to the greater of:

        (i)      his Compensation during the Plan Year immediately prior to such date plus an annual salary increase of seven percent (7%); and

        (ii)     his Compensation during the Plan Year in which such date occurs . . .

11. Totally and Permanently Disabled - SERP § 1.19

§ 1.19  "The words 'Totally and Permanently Disabled' shall mean for any Participant that he has a total and permanent disability as defined in the Capital Accumulation Plan [CAP]."

12. Permanent and Total Disability - CAP § 2.30

CAP § 2.30  "The words 'permanent and total disability' shall mean a physical or mental condition of a participant which renders such participant permanently unable to perform the duties of his occupation . . ."

13. Withdrawal of Designation as Senior Executive - SERP § 2.4

SERP § 2.4  "At any time after the effective date of this Plan, the Board of Directors may, in its sole discretion, determine that any employee, who has not attained his Normal Retirement Date, terminated his employment, become Totally and Permanently Disabled or died, and who shall have previously been designated by it as a Senior Executive, is no longer entitled to be so designated and may withdraw such designation with respect to such employee.  The withdrawal of the designation of an employee as a Senior Executive shall become effective as of the date specified by the Board of Directors which date may not be earlier than the date upon which the Board of Directors determines such employee is no longer a Senior Executive . . . "